# EXHIBIT A

KEMPER VALVE & FITTINGS CORP.
CONFIDENTIALITY AND NON-COMPETE AGREEMENT

This CONFIDENTIALITY AND NON-COMPETE AGREEMENT is made as of the 7th day of March, 2001 between KEMPER VALVE & FITTINGS CORP., an Illinois corporation with its principal office in Wauconda, Illinois (the "Company"), and BUDDY WOOD of Illinois ("Employee").

WITNESSETH:

WHEREAS, Company now has and expects to develop confidential, proprietary and/or trade secret information and materials and highly sensitive information of immeasurable value, which Employee recognize must be carefully protected for Company to be successful;

WHEREAS, Company now has and expects to develop long term customer relationships and information concerning such customers and their needs and requirements, which are also of immeasurable value to Company and which Employee recognize must be carefully protected for Company to be successful;

WHEREAS, Company will employ or is currently employing Employee in a position of trust and confidence;

WHEREAS, this Agreement is a material inducement for Company to continue to employ Employee and allow the Employee to participate in the Kemper Valve & Fittings Corp. 2000 Incentive Compensation and Employee agrees to the following obligations and covenants in consideration of his continued employment by Company and the Employee's being selected to participate in the Kemper Valve & Fittings Corp. 2000 Incentive Compensation Plan;

1.  KEMPER VALVE & FITTINGS CORP. 2000 INCENTIVE COMPENSATION PLAN. Employee specifically acknowledges and agrees to the covenants set forth in Section 2 in consideration for the Employee's participation in the Kemper Valve & Fittings Corp. 2000 Incentive Compensation Plan as well as in consideration of his continued employment by Company.

2.  (a)  Position of Loyalty. In the course of Employee's past and future employment with the Company, and because of the nature of Employee's responsibilities, Employee has previously acquired, and may in the future acquire additional, valuable trade secrets, proprietary data and other confidential information (collectively, "Confidential Information") with respect to the Company's customers, suppliers, competitors and business. Such trade secrets, proprietary data and other confidential information include

but are not limited to the following: the Company's existing and contemplated services, products, business and financial methods and practices, plans, pricing, selling techniques, manufacturing systems, computer hardware and software systems, product technologies and formulae, and special methods and processes involved in providing services, lists of the Company's present and prospective suppliers and/or customers, methods of obtaining suppliers and customers, credit and financial data of the Company's present and prospective suppliers and/or customers, particular business requirements of the Company's present and prospective customers, inventions and confidential engineering, products or technical data, including plans, specifications, drawings and sketches. In addition, Employee on behalf of the Company, has developed, and may in the future further enhance or develop, personal acquaintances and relationships with the Company's present and prospective suppliers and customers, which acquaintances and relationships may constitute the Company's only contact with such persons or entities. As a consequence thereof, the parties agree that Employee occupies or will occupy a position of trust and confidence with respect to the Company's affairs and its products and services. In view of the foregoing and in consideration of the remuneration to be paid to Employee under the Kemper Valve & Fittings Corp. 2000 Incentive Compensation Plan and for his employment, Employee acknowledges and agrees that it is reasonable and necessary for the protection of the goodwill and business of the Company that Employee make the covenants contained in subparagraphs (b) through (f) below regarding the conduct of Employee during and subsequent to employment with the Company, and that the Company will suffer irreparable injury if Employee engages in conduct prohibited thereby. Employee represents that observance of the aforementioned covenants will not cause Employee any undue hardship nor will it unreasonably interfere with Employee's ability to earn a livelihood. The covenants contained in subparagraphs (b) through (f) below shall each be construed as a separate agreement independent of any other provision of this Agreement, and the existence of any claim or cause of action of Employee against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of any of those covenants.

      (b) <u>Non-Disclosure</u>. Employee, while in the employ of the Company or at any time thereafter, will not, without the express written consent of the Company, directly or indirectly communicate or divulge to, or use for his own benefit or for the benefit of any other person, firm, association or corporation, any of the Company's Confidential Information which was communicated to or otherwise learned of or acquired by Employee during the course of his employment with the Company; provided, however, Employee may disclose or use such information under any of the following circumstances: (i) disclosure or use thereof in good faith by Employee in connection with the performance of his duties in the course of his employment by the Company, and (ii) disclosure or use by Employee of any such information or data which is generally known within the industry or is otherwise available through independent sources.

      (c) <u>Return of Information</u>. Promptly after the termination of his employment with the Company for any reason and whether or not pursuant to an employment agreement, Employee will deliver to the Company all originals and copies of all Confidential Information, including but not limited to memoranda, customer lists, samples, records,

documents, computer programs, product information and other materials requested by the Company which he has obtained from the Company while serving in any such capacity.

(d) <u>Non-Competition</u>. During Employee's employment with the Company, and for a period of two (2) years following termination of Employee's employment with the Company for any reason whatsoever (or, if this period shall be unenforceable by law, then for such lesser period as shall be required by law to make the provisions of this subparagraph enforceable), Employee shall not, in any state of the United States or in any foreign country where the Company is conducting its business, without the express written consent of the Company, directly or indirectly, own, manage, participate in or otherwise engage in or have any connection with any business which provides any product or service now or at any time provided by the Company during Employee's employment with the Company except that Employee shall not be precluded hereby from (i) owning stock or any other securities in a publicly traded company where such investment entitles Employee to less than 1% of the voting control over such company, or (ii) working as an employee, after the termination of Employee's employment with the Company, for any entity in which Employee has no ownership interest, or option or other right to acquire an ownership interest, in any capacity where the likelihood of Employee's breach or violation of the provisions of subparagraphs (b) and (f) is demonstrated to the reasonable satisfaction of the Company to be remote.

(e) <u>Non-Solicitation of Customers</u>. During Employee's employment with the Company, and for a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever (or if this period shall be unenforceable by law, then for such lesser period as shall be required by law to make the provisions of this subparagraph enforceable), and except in the good faith furtherance of the interests of the Company, Employee will not, without the express written consent of the Company, contact (whether or not initiated by Employee), with a view toward selling any product or service competitive with any product or service sold, to Employee's knowledge, or proposed to be sold by the Company at the time of such contact, any person, firm, association or corporation: which during the preceding two years was one of the top twenty (20) customers of the Company. Employee will not directly or indirectly make any such contact, either for his benefit or for the benefit of any person, firm, association or corporation, and Employee will not in any manner assist any such person, firm, association or corporation to make any such contact.

(f) <u>Non-Interference</u>. During Employee's employment with the Company, and for a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever (or if this period shall be unenforceable by law, then for such lesser period as shall be required by law to make the provisions of this subparagraph enforceable), Employee shall not induce or encourage, directly or indirectly, (i) any employee of the Company to leave his or her employment, or to seek employment with anyone other than the Company, unless it has been determined by the Company that such employee's performance or other characteristics or circumstances are such that employee's leaving the Company is in the best interests of the Company, or (ii) any customer or supplier of the Company to modify or terminate any relationship, whether or

not evidenced by a written contract, with the Company unless it has been determined by the Company that such modification or termination is in the best interests of the Company.

3.    SPECIFIC PERFORMANCE. Employee acknowledges and agrees that the restrictions set forth in Section 2 are reasonable and necessary for the protection of the Company's business and goodwill and that the Company will suffer irreparable injury if Employee engages in the conduct prohibited thereby. Employee further agrees that if he breaches or attempts to breach any of his obligations under Section 2, the Company, in addition to any other remedies available to it under law, may obtain injunctive relief against him to prevent such continued or attempted breach, with no bond or surety required by Company in connection therewith, and the Company may recover any damages it may incur as a result of any such continued or attempted breach and for the enforcement of Section 2. The Company shall also have all rights and remedies set forth in the Kemper Valve & Fittings Corp. 2000 Incentive Compensation Plan.

4.    WAIVER. The waiver by either party of a breach or provision of this Agreement by the other shall not operate or be construed as a waiver of any subsequent breach by such other party.

5.    AMENDMENT. This Agreement may not be changed orally or rescinded, but may only be changed or rescinded by a written instrument signed by the party to be changed.

6.    NOTICES. Any notice permitted or required hereunder shall be sufficient if in writing, sent by registered or certified mail, return receipt requested, and, in the case of the Company or the Company, to its principal business address, and in the case of Employee, to his last known residence address as listed on Employee's records with the Company, or as otherwise provided in a written notice by a party.

7.    BENEFITS AND ASSIGNABILITY. This Agreement shall inure to the benefit of and be binding upon the parties and their successors and assigns, provided, however, the duties of Employee under this Agreement are personal to him and may not be assigned by him.

8.    SEVERABILITY. The invalidity, illegality, or unenforceability of any provision hereof shall not in any way affect, impair, invalidate or render unenforceable this agreement or any other provision hereof.

9.    GOVERNING LAW. Notwithstanding that any of the parties hereto may now, or at any time during the term of this Agreement, be domiciled outside of the State of Illinois, this Agreement shall be regarded for all purposes as an Illinois document and the validity and construction hereof, and all acts and payments required hereunder, shall be determined and governed, in all respects, by the laws of the State of Illinois.

IN WITNESS WHEREOF, the parties hereto have caused these presents to be duly executed the day and year above written.

KEMPER VALVE & FITTINGS CORP.

By: _____

Its:  President

EMPLOYEE:

_____
BUDDY WOOD

**KEMPER VALVE & FITTINGS CORP.**
<u>INCENTIVE COMPENSATION PLAN</u>
<u>PLAN AGREEMENT</u>

I, the undersigned, hereby acknowledge that as a Key Executive (as determined by the Company) of Kemper Valve & Fittings Corp., an Illinois corporation (the "Company"), I have been offered and have accepted the opportunity to participate in the Kemper Valve & Fittings Corp. Incentive Compensation Plan (the "Plan"). I hereby agree to be bound by all the terms and conditions of the Plan.

I understand that amounts allocated to me under the Plan will become vested according to the following schedule if I am employed by the Company on such date:

| | Percent of Allocation Vested | Date Vested |
|---|---|---|
| 1. | 20% | Last day of the Plan Year for which the contribution was allocated |
| 2. | 40% | Last day of the first (1st) Plan Year following the Plan Year for which contribution was allocated |
| 3. | 60% | Last day of the second (2nd) Plan Year following the Plan Year for which contribution was allocated |
| 4. | 80% | Last day of the third (3rd) Plan Year following the Plan Year for which contribution was allocated |
| 5. | 100% | Last day of the fourth (4th) Plan Year following the Plan Year for which contribution was allocated |

I hereby designate the following as my primary beneficiary under the Plan:

_Karen Wood_
Name

_P.O. Box 267_
Address

_Sulphur OK. 73086_

I hereby designated the following as my contingent beneficiary under the Plan:

_Jade Tucker_
Name

_12ao E, 3rd_
Address

_Sulphur OKLA    72086_

I acknowledge that the term Beneficiary as used in the Plan shall mean the primary beneficiary if such primary beneficiary survives me by at least thirty (30) days and shall mean the contingent beneficiary if the primary beneficiary does not survive me by at least thirty (30) days and shall mean my spouse, or if none, my issue per stirpes, or if none, my estate, if neither the primary nor the contingent beneficiaries survive me by at least thirty (30) days.

I hereby reserve the right to change my beneficiary designation at any time and from time to time without the consent of any beneficiary. Such change shall be made in the manner required by the Board and shall not be effective until acknowledged in writing by the Board.

As a condition to my participating in the Plan I hereby agree to execute and be bound by the terms and conditions that certain Confidentiality and Non-Disclosure Agreement substantially in the form of Exhibit C to the Plan. I further agreed that the entire balance in my Incentive Compensation Account, vested and unvested, will be forfeited if I violate or breach any of the terms and conditions of the Confidentiality and Non-Compete Agreement.

I further acknowledge that the Plan may be terminated at any time, at the sole discretion of the Company, without any obligation on the part of the Company, except as specifically provided in Section 7.1 of the Plan.

IN WITNESS WHEREOF, the parties hereto have caused this Plan Agreement to be executed on this 7th day of March, 2001.

KEMPER VALVE & FITTINGS CORP.

Attest:

By: _Guthrun Kemper_

Title:

_Buddy Wood_
Buddy Wood, Participant

Secretary

2

AMENDED AND RESTATED
KEMPER VALVE & FITTINGS CORP.
2000 INCENTIVE COMPENSATION PLAN

ARTICLE 1
PURPOSE

1.1   The purpose of this Plan is to assist Kemper Valve & Fittings Corp., an Illinois corporation (the "Company"), in retaining and motivating its key executives and allowing them to share in the long term growth of the Company.  To achieve this purpose the Plan provides a method of compensating key executives which is over and above the Company's present practice.  The Company, effective October 1, 2000, adopted the Kemper Valve & Fittings Corp. 2000 Incentive Compensation Plan for the purposes set forth herein and desires to amend and restate such plan to permit the deferral of compensation in accordance with section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), effective as of October 1, 2004.

ARTICLE 2
DEFINITIONS

As used in the Plan each of the following terms shall have the meaning set forth below:

2.1   "Administrator" shall mean the Board or the Compensation Committee selected to administer the Plan.

2.2   "Beneficiary" shall mean any person, including a fiduciary, designated by a Participant to receive any benefit payable upon the death of the Participant.  The term shall also include contingent beneficiaries.

2.3   "Board" shall mean the current Board of Directors of the Company.

2.4   "Cause" means (i) the conviction of the Participant of committing a felony under Federal law or the law of the state in which such action occurred, (ii) dishonesty in the course of fulfilling the Participant's duties as an employee the Company or (iii) willful and deliberate failure on the part of the Participant to perform such duties in any material respect.  The determination of Cause shall be made by the Administrator, in its sole discretion.

2.5   "Company" shall mean Kemper Valve & Fittings Corp., an Illinois corporation.

2.6   "Compensation Committee" means a committee of Directors appointed by the Board to administer this Plan.

2.7   "Disability" means (i) the Participant is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

1

expected to result in death or can be expected to last for a continuous period of not less than 12 months, or (ii) the Participant is receiving income replacement benefits for a period of at least 3 months under an accident and health plan maintained by the Company by reason of the Participant having a medically determinable physical or mental impairment which can be expected to result in death or last for a continuous period of at least 12 months, or (iii) the Social Security Administration has made a determination that the Participant is totally disabled, or an insurance company has made a determination that the Participant is disabled in accordance with a disability insurance program, provided that the definition of disability applied under such disability program complies with the requirements described herein.

2.8    "Key Executive" shall mean a full time executive of the Company who, in the sole opinion and discretion of the Administrator, can make a special contribution to the growth and success of the Company and is designated as such in writing by the Administrator.

2.9    "Net Operating Income Before Taxes" shall mean the net operating income of the Company before any deduction for income taxes as set forth in its financial statements for each Plan Year.

2.10    "Net Operating Loss" shall mean the net operating loss of the Company as set forth in its financial statements for each Plan Year.

2.11    "Participant" shall mean a Key Executive who is chosen by the Administrator to participate in the Plan and who has executed a Plan Agreement.

2.12    "Plan" shall mean this Amended and Restated Kemper Valve & Fittings Corp. 2000 Incentive Compensation Plan, as it may be amended or supplemented from time to time.

2.13    "Plan Agreement" shall mean an agreement in the form attached hereto as Exhibit A to be executed by each Key Executive who has been selected to become a Participant.

2.14    "Plan Year" shall initially mean the fiscal year beginning October 1, 2000 and each subsequent fiscal year during which the Plan is in effect. The first fiscal year after this amendment and restatement shall begin October 1, 2004.

2.15    "Incentive Compensation Account" shall mean a separate bookkeeping account maintained for each Participant reflecting the Participant's interest in the Plan.

2.16    "Retirement" shall mean retirement at age 65.

2.17    "Separation from Service" or "Separates from Service" shall mean a severance of the employer-employee relationship between the Participant and the Company. Notwithstanding anything herein to the contrary, for the purposes of determining if a Participant is entitled to a distribution of benefits only, the Participant's employment is considered not to be terminated while

2

the Participant is on military leave, sick leave, or any other bona fide leave of absence (such as temporary employment with the government) if the period of such leave does not exceed 6 months, or if longer, so long as the Participant's right to reemployment with the Company is provided by either statute or contract. If the period of leave exceeds 6 months and the Participant's right to reemployment is not provided by statute or by contract, the employer-employee relationship is deemed to terminate the first day immediately following such 6-month period.

ARTICLE 3
PARTICIPATION

3.1     Eligibility.  Each Key Executive shall be eligible to become a Participant.

3.2     Commencement of Participation.  Each Key Executive who is selected by the Administrator to become a Participant shall commence participation in the Plan immediately upon execution of a Plan Agreement and shall be eligible to receive an allocation under the Plan with respect to the Plan Year during which he or she becomes a Participant.

3.3     Termination of Participation.  Any Participant who Separates from Service, for any reason, or changes status so that such Participant, as determined in the sole discretion of the Administrator, is no longer considered a Key Executive, shall cease to be a Participant immediately upon the happening of such event and shall not be entitled to an allocation under the Plan during such Plan Year.

ARTICLE 4
DETERMINATION AND ALLOCATION OF INCENTIVE COMPENSATION

4.1     Determination of Net Operating Income Before Taxes or Net Operating Loss.  As promptly as possible after the close of each Plan Year, the Company's accounting firm and the Administrator shall jointly determine the Net Operating Income Before Taxes or Net Operating Loss of the Company for such year, based on generally accepted accounting principles. Such Net Operating Income Before Taxes or Net Operating Loss shall be the net income or loss, as the case may be, of the Company for the Plan Year, but with the following modifications:

(a)     No deduction shall be made for compensation paid under this Plan;

(b)     In the sole discretion of the Administrator, adjustments may be made to such Net Operating Income Before Taxes or Net Operating Loss for unusual occurrences, such as, but not limited to subtracting from Net Operating Income Before Taxes gains from the sale of assets or products sales not occurring in the ordinary course of business.

4.2     Formula for Determining Contributions to Plan.  For each Plan Year that the Company has Net Operating Income Before Taxes and pursuant to the requirements set forth in

3

Exhibit B is required to allocate an amount to the Plan, the Company shall allocate to the Plan an amount (the "Total Allocation Amount") equal to the amount determined pursuant to the formula set forth in Exhibit B. In addition to the Total Allocation Amount, the Company, in its sole discretion, may allocate to the Plan additional amounts it deems appropriate to accomplish the objectives of this Plan ("Discretionary Contributions"). Unless otherwise designated by the Company such Discretionary Contributions shall be allocated and accounted for in the same manner as the Total Allocation Amount.

　　　4.3　　Participant's Incentive Compensation Accounts. The Company shall maintain a separate Incentive Compensation Account for each Participant. Promptly after the close of each Plan Year, the Company shall credit each Participant's Incentive Compensation Account as provided in Sections 4.4. Incentive Compensation Accounts shall be for purposes of record keeping only and shall not be funded.

　　　4.4　　Credit of Share of Total Allocation Amount to Incentive Compensation Accounts. With respect to each Plan Year in which the Company is obligated pursuant to the requirements set forth in Exhibit B hereto to make an allocation to the Plan, the Administrator shall allocate the Total Allocation Amount thereof among the Participants as follows:

　　　　　(a)(i)　　Seventy-Five percent (75%) of the Total Allocation Amount shall be allocated to the Participants' Incentive Compensation Accounts in a manner determined by the Administrator, in its sole discretion. In exercising its discretion under Section 4.4(a)(i) hereof, the Administrator shall take into consideration each Participant's duties and responsibilities, performance, level of commitment to the growth and success of the Company, ability to work cooperatively with others to foster the Company's growth and success, and such other factors as the Board shall deem appropriate.

　　　　　(ii)　　Twenty-Five percent (25%) of the Total Allocation Amount shall be allocated to each Participant's Incentive Compensation Account in the same proportion that each Participant's total salary for the Plan Year bears to the total salary, of all Participants for such Plan Year.

　　　　　(b)　　The Administrator may appropriately pro-rate the allocations of Participants whose participation in the Plan did not begin on the first date of a Plan Year.

　　　4.5　　Statement of Incentive Compensation Accounts. Promptly after the Total Allocation Amount for a Plan Year has been allocated to Participants' Incentive Compensation Accounts, the Company shall prepare and send to each Participant a complete statement of his or her Incentive Compensation Account.

4

ARTICLE 5
PAYMENT OF SELECTIVE COMPENSATION

5.1     Vesting of Amounts Standing in Incentive Compensation Accounts.  Amounts allocated to the Incentive Compensation Account of any Participant, shall become vested in accordance with the vesting schedule set forth in the Plan Agreement.

5.2     Forfeitures.

(a)     Voluntary Termination and Involuntary Termination Without Cause.  If a Participant Separates from Service for any reason other than involuntary termination for Cause, Retirement, Disability or death, all amounts standing in such Participant's Incentive Compensation Account that are not vested shall be forfeited.

(b)     Involuntary Termination For Cause.  If a Participant Separates from Service because of involuntary termination for Cause, all amounts standing in such Participant's Incentive Compensation Account, vested or unvested, shall be forfeited.

(c)     Competition/Breach of Contract.  All amounts standing in a Participant's Incentive Compensation Account, vested and unvested, and any rights to future payments relating to such Incentive Compensation Account shall be forfeited if the Participant violated or breaches any provisions of any employment, confidentiality or separation agreement entered into with the Company, including but not limited to the Confidentiality and Non-Compete Agreement entered into or to be entered into between the Participant and the Company in the form attached hereto as Exhibit C.

The amount of such forfeiture shall be removed from the Company's books and records and the Company shall have no further liability or obligation in connection with such forfeited amount.

5.3     Separation from Service as a Result of Retirement or Disability.  If a Participant Separates from Service as a result of Retirement or Disability, all amounts in the Participant's Incentive Compensation Account will vest and the Company shall pay to such Participant the balance in his or her Incentive Compensation Account, determined as of the last day of the Plan Year immediately preceding or coinciding with the date the Retirement or Disability occurs.  Such payment shall be made in sixty (60) equal monthly installments, commencing 90 days after the end of the month in which the Participant retired or became disabled.  Unpaid amounts will not bear interest.  In the event a former Participant recovers from a Disability and is reemployed by the Company, any remaining balance of monthly installments payable after the Participant's date of reemployment shall no longer be paid to the Participant, but shall instead be credited to the Participant's Incentive Compensation Account and shall be paid in accordance with the other provisions of this Article 5.

5.4    <u>Separation from Service as a Result of Death</u>.  In the event of a Participant's Separation from Service as a result of death, the balance in such Participant's Incentive Compensation Account shall be 100% vested, and such balance determined as of the day the Participant's death occurs shall be paid to the Participant's Beneficiary.  Such balance shall be paid in equal monthly installments over sixty (60) months, commencing 90 days after the end of the month following the date the Participant dies.  Unpaid amounts will not bear interest.

5.5    <u>Payment of Vested Amounts After Voluntary Separation from Service</u>.  If a Participant Separates from Service voluntarily any vested amounts standing in such Participant's Incentive Compensation Account as of the date of such Separation of Service shall be paid by the Company to the Participant in sixty (60) equal monthly installments.  The first such installment shall be payable on or before January 1st of the Plan Year succeeding the year in which the Participant reaches (i) his 55th birthday or (ii) terminates employment, whichever is later and subsequent installments shall be payable on or before the first day of each month thereafter for 59 months. Unpaid amounts will not bear interest.  If a former Participant who was receiving or was entitled to receive payments in accordance with this section dies, payments shall be made under this section to the former Participant's Beneficiary at the same times and in the same amounts as would have been made to the deceased former Participant had he or she survived.

5.6    <u>Payment of Vested Amounts After Involuntary Separation from Service Without Cause</u>. If a Participant Separates from Service occurs involuntary, without cause any vested amounts standing in such Participant's Incentive Compensation Account as of the date of such Separation of Service shall be paid by the Company to the Participant in sixty (60) equal monthly installments. The first such installment shall be payable on or before January 1st of the Plan Year succeeding the year in which the Participant (i) reaches his 55th birthday or (ii) his employment is terminated, which ever is later and subsequent installments shall be payable on or before the first day of each month thereafter for 59 months.  Unpaid amounts will not bear interest.  If a former Participant who was receiving or was entitled to receive payments in accordance with this section dies, payments shall be made under this section to the former Participant's Beneficiary at the same times and in the same amounts as would have been made to the deceased former Participant had he or she survived.

5.7    <u>Change in Control of Company</u>.  If at any time, either of the events listed in (a) or (b) below ("Change in Control Event") occurs, then each Participant's balance in his or her Incentive Compensation Account shall be deemed to be 100% vested as of the last day of the Plan Year prior to the year in which such Change in Control Event occurs.

(a)    <u>Change in Ownership</u>.  If at any time a person or more than one person acting as a group acquires ownership of stock of the Company that, together with stock held by such person or group, constitutes more than 50% of the total fair market value or total voting power of the stock of the Company.  Notwithstanding the foregoing, transfers between and among current shareholders of the Company, active employees of the Company who purchase stock in the future, their survivors, their heirs, trusts set up for their benefit or for the benefit of their heirs, other entities which they or

their heirs control and foundations set up by such shareholders, shall not be considered in determining whether a Change in Ownership has occurred.

(b)   Change in Ownership of a Substantial Portion of the Company's Assets. If at any time a person or more than one person acting as a group acquires (or has acquired during the 12-month period ending on the date of the most recent acquisition by such person or persons) assets of the Company that have a total gross fair market value equal to or more than 60% of the total gross fair market value of all assets of the Company immediately prior to such acquisition or acquisitions. For the purpose of this section 5.7(b), gross fair market value means the value of the assets of the Company, or the value of assets being disposed of, determined without regard to any liabilities associated with those assets.

If a Change in Control Event occurs which satisfies the above requirements and the statutory requirements for a "change in the ownership" or a "change in the ownership of a substantial portion of the assets" of the Company, as described in section 409A(a)(2)(A)(v) of the Code, payment of the Participants' Incentive Compensation Accounts to the Participants shall be made as follows: (i) to the extent that the consideration relating to a Change in Control Event is paid in cash at the Closing of such event, payments to the Participants shall be made in lump sum within one hundred eighty (180) days of the date such event occurs, or (ii) in the event payment of consideration relating to a Change in Control Event is deferred, payments to the Participants shall be paid on the same schedule and in accordance with the same terms and conditions as consideration is to be paid to the shareholders or the Company, to the extent permitted by section 409A of the Code. In all cases, all payments to the Participants shall be made within five (5) years after the Change in Control Event.

5.8   Beneficiary Designation.   A Participant may designate in writing on the Plan Agreement or on such other forms as are prescribed by and filed with the Board, a Beneficiary or Beneficiaries to receive any amount payable as a result of a Participant's death. A Participant may at any time revoke and change any such designation without the consent of any prior Beneficiary, but no such change shall be effective until acknowledged in writing by the Board. If no beneficiary designation is in effect at the time of a Participant's death or if no properly designated Beneficiary survives a Participant, then the Participant's Beneficiary under this Plan shall be the Participant's surviving spouse, or if none, the Participant's issue per stirpes, or if none, the Participant's estate.

5.9   Withholding of Taxes.   Any taxes of any nature required to be withheld by the Federal, state, or local government shall be deducted from all payments under the Plan and shall be paid over to the proper government agency for the account of the Participant. The Participant shall be responsible for all federal, state or local income or other tax liability for any monies paid to the Participant pursuant to this Plan. If any governmental body determines that taxes owed by the Participant on those monies exceeds the amounts already withheld by the Company, if any, the Participants agrees to pay those amounts and will hold the Company harmless for any such amounts and related penalties.

## ARTICLE 6
## ADMINISTRATION

6.1    <u>Administrator to Administer the Plan</u>.  The Plan shall be administered by the Administrator.

6.2    <u>Responsibilities</u>.  In addition to its duties as elsewhere set forth herein, the Administrator's functions shall include the interpretation of the Plan and the establishment of rules and regulation governing the operation of the Plan.  The Administrator, in discharging its responsibilities under the Plan, may delegate to other persons such duties as it deems appropriate.

6.3    <u>Decisions</u>.  Any decision or action made or taken by the Administrator, arising out of or in connection with the construction, administration, or interpretation of the Plan and its rules and regulations, shall be conclusive and binding upon all Participants and any person claiming through or under any Participant.

## ARTICLE 7
## AMENDMENT AND TERMINATION

7.1    <u>Right to Amend or Terminate</u>.  The Board shall have the right to terminate, amend, modify or supplement the Plan at any time, provided that no amendment or termination shall have a material adverse effect upon rights unvested or vested or amounts being paid as of the date of such amendment or termination.

7.2    <u>Effect of termination</u>.  Upon termination of the Plan, neither the Plan nor any Plan Agreement shall be of any further force or effect and no party shall have any further obligation under either the Plan or any Plan Agreement, except as provided in section 7.1.  Should the Plan be terminated, each Participant shall receive notice of when such termination shall be effective.

Upon termination of the Plan all amounts credited to a Participant's Incentive Compensation Account shall be vested and such amounts will be paid as set forth herein as if the Plan had not been terminated.

## ARTICLE 8
## PROHIBITION AGAINST FUNDING

8.1    It is intended that this Plan be an "unfunded" plan for incentive and deferred compensation.  No Participant or other person shall have any interest in any particular assets of the Company by reason of the right to receive a benefit under the Plan, and any such Participant or other person shall have only the right of a general unsecured creditor of the Company with respect to any benefits payable under the Plan.    Should the Company elect to acquire any insurance or annuity contract or other investment in connection with the liabilities assumed by it under the Plan, it is expressly understood and agreed that the Participants shall not have any right with respect to, or

8

claim against, such assets nor shall any such purchase be construed to create a trust of any kind or any fiduciary relationship between the Company and the Participants, their Beneficiaries or any other person. Any such assets shall be and remain a part of the general, unpledged and unrestricted assets of the Company, subject to the claims of its general creditors. The Participants and their Beneficiaries shall be required to look to the provisions of the Plan and to the Company itself for enforcement of any and all benefits due under the Plan and to the extent any person acquires a right to receive payment under the Plan, such right shall be no greater than the right of any unsecured, general creditor of the Company. The Company shall be designated owner and beneficiary of any insurance or annuity contract acquired in connection with its obligations under the Plan.

## ARTICLE 9
## GENERAL PROVISIONS

9.1    <u>Inalienability</u>. No benefit or payment under the Plan shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, whether voluntary or involuntarily, and no attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge the same shall be valid. Nor shall any such benefit or payment be in any way liable for or subject to the debts, contracts, liabilities, engagements or torts of any person entitled to such benefit or payment, except to such extent as may be required by applicable law. If any person entitled to a benefit or payment under the Plan becomes bankrupt or attempts to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge any benefit or payment under the Plan, in whole or in part, or if any attempt is made to subject any such benefit or payment, then such benefit or payment, in the discretion of the Company, shall cease and terminate with respect to such person, and the Company in such case shall hold or apply the same or any part thereof for the benefit of any dependent, relative or beneficiary of such person, in such manner and proportion as the Company may deem proper.

9.2    <u>No Enlargement of Employment Rights</u>. The establishment of the Plan shall not be construed to confer upon any Participant the legal right to be retained in the employ of the Company or give any Participant or Beneficiary any right to any payment whatsoever, except to the extent of the benefits provided for hereunder. All Participants shall remain subject to discharge to the same extent as if the Plan had never been adopted.

9.3    <u>Incompetency</u>. If the Board determines that any person to whom a benefit is payable under the Plan is incompetent by reason of age or physical or mental disability, the Board shall have the power to cause the payments becoming due to such person to be made to another for his benefit, upon proof of legal authority of such person, without the responsibility to see to the application of such payments. Any payment made pursuant to such power shall, as to the amount of such payment, operate as a complete discharge of the Company.

9.4    <u>Identification of Recipient</u>. If at any time any doubt exists as to the identity of any person entitled to any payment hereunder or the amount or time of such payment, the Company shall be entitled to hold such sum until such identity or amount or time is determined or until an order of a

9

court of competent jurisdiction is obtained. Alternatively, the Company shall also be entitled to pay such sum into court in accordance with the appropriate rules of law.

9.5    <u>Effect on Other Benefits</u>.  The benefits of a Participant under this Plan shall be in addition to any benefits paid or payable to or on account of the Participant under any other pension, disability, equity, annuity or retirement plan or policy whatsoever. Nothing herein contained shall in any manner modify, impair or affect and existing or future rights of a Participant to receive any employee benefits to which he or she would otherwise be entitled or to participate in any current or future pension plan of the Company or any supplemental arrangement which constitutes a part of the Company's regular compensation structure. However, any amounts credited under this Plan shall not be deemed part of a Participant's total compensation for the purpose of computing benefits to which he or she may be entitled under any pension plan or other supplemental compensation arrangement, unless such plan or arrangement specifically provides to the contrary.

9.6    <u>Unclaimed Benefits</u>.  If the Company shall be unable, with one year after any benefits becomes payable to any person under the Plan, to make a distribution to such person because of the Company's liability to ascertain such person's whereabouts by mailing to the last known address of such person on the records of the Company, and such person has not made a written claim for the benefit before the expiration of the one year period, then the Company shall declare all rights of such person under this Plan to be forfeited as of such date as the Company shall determine.

9.7    <u>Expenses</u>.  The expenses incurred in administrating the Plan shall be borne by the Company and shall not be charged against the Participants or any benefits payable under the Plan.

9.8    <u>Applicable Law</u>.  The Plan shall be governed by and construed and administered under the laws of the State of Illinois.

9.9    <u>Binding Effect</u>.  This Plan shall be binding upon the parties hereto, their heirs, executors, administrators, successors and assigns. Subject to Section 5.7, in the event of a merger, consolidation, or reorganization involving the Company, this Plan shall continue in force and become an obligation of the Company's successor or successors.

9.10    <u>Severability</u>.  If any provision of this Plan is held invalid or unenforceable, its invalidity or unenforceability shall not affect any other provisions of the Plan and the Plan shall be construed and enforced as if such provision had not been included herein.

9.11    <u>Captions</u>.  The article and section headings contained herein are inserted only for the convenience of reference and in no way define, limit, enlarge or describe the scope or intent of the Plan, nor in any way shall they affect the Plan or the construction of any provision thereof.

9.12    <u>Gender and Number</u>.  The masculine gender wherever used herein shall be deemed to include the feminine. Words in the singular shall be read and construed as though used in the plural in all cases where they would so apply and vice versa.

10

9.13   <u>Unfunded Plan</u>.   The Plan is intended to constitute an unfunded selective compensation plan for a select group of executives and management.

9.14   <u>Plan to Comply with Code Section 409A</u>.   Notwithstanding any provision to the contrary in this Plan, each provision in this Plan shall be interpreted to permit the deferral of compensation in accordance with section 409A of the Code and any provision that would conflict with such requirements shall not be valid or enforceable.

IN WITNESS WHEREOF, the parties hereto have caused this Plan Agreement to be executed on this 1st day of October, 2004.

KEMPER VALVE & FITTINGS CORP.

By: _____

Its: _____

EXHIBIT A
AMENDED AND RESTATED
KEMPER VALVE & FITTINGS CORP.
INCENTIVE COMPENSATION PLAN
PLAN AGREEMENT

I, the undersigned, hereby acknowledge that as a Key Executive (as determined by the Company) of Kemper Valve & Fittings Corp., an Illinois corporation (the "Company"), I have been offered and have accepted the opportunity to participate in the Amended and Restated Kemper Valve & Fittings Corp. Incentive Compensation Plan (the "Plan"). I hereby agree to be bound by all the terms and conditions of the Plan.

I understand that amounts allocated to me under the Plan will become vested according to the following schedule if I am employed by the Company on such date:

|  | Percent of Allocation Vested | Date Vested |
|---|---|---|
| 1. | 20% | Last day of the Plan Year for which the contribution was allocated |
| 2. | 40% | Last day of the first (1st) Plan Year following the Plan Year for which contribution was allocated |
| 3. | 60% | Last day of the second (2nd) Plan Year following the Plan Year for which contribution was allocated |
| 4. | 80% | Last day of the third (3rd) Plan Year following the Plan Year for which contribution was allocated |
| 5. | 100% | Last day of the fourth (4th) Plan Year following the Plan Year for which contribution was allocated |

I hereby designate the following as my primary beneficiary under the Plan:

_____
Name

_____
Address

_____

12

I hereby designated the following as my contingent beneficiary under the Plan:

_____
Name

_____
Address

_____

     I acknowledge that the term Beneficiary as used in the Plan shall mean the primary beneficiary if such primary beneficiary survives me by at least thirty (30) days and shall mean the contingent beneficiary if the primary beneficiary does not survive me by at least thirty (30) days and shall mean my spouse, or if none, my issue per stirpes, or if none, my estate, if neither the primary nor the contingent beneficiaries survive me by at least thirty (30) days.

     I hereby reserve the right to change my beneficiary designation at any time and from time to time without the consent of any beneficiary.  Such change shall be made in the manner required by the Board and shall not be effective until acknowledged in writing by the Board.

     As a condition to my participating in the Plan I hereby agree to execute and be bound by the terms and conditions that certain Confidentiality and Non-Disclosure Agreement substantially in the form of Exhibit C to the Plan.  I further agreed that the entire balance in my Incentive Compensation Account, vested and unvested, will be forfeited if I violate or breach any of the terms and conditions of the Confidentiality and Non-Compete Agreement.

     I further acknowledge that the Plan may be terminated at any time, at the sole discretion of the Company, without any obligation on the part of the Company, except as specifically provided in Section 7.1 of the Plan.

     IN WITNESS WHEREOF, the parties hereto have caused this Plan Agreement to be executed on this ___ day of _____, 20__.

KEMPER VALVE & FITTINGS CORP.

Attest:                     By:_____
                                     Title:

_____       _____
Secretary                       Participant

EXHIBIT B
KEMPER VALVE & FITTINGS CORP.
FORMULA FOR
DETERMINING CONTRIBUTIONS

| Net Income Before Taxes | Percentage of Net Income Before Taxes Allocated to Plan |
|---|---|
| 0 to $499,999 | 0% |
| $500,000 to $749,999 | 1% |
| $750,000 to $999,999 | 2% |
| $1,000,000 to $1,499,999 | 3% |
| $1,500,000 to $1,999,999 | 4% |
| $2,000,000 to $2,999,999 | 5% |
| $3,000,000 to $3,999,999 | 7.5% |
| over $4,000,000 | 10% |

The above stated "Percentage of Net Income Before Taxes allocated to Plan" are based on seven or more Participants in the Plan. In the event there are less then seven Participants the Company, in its sole discretion, may prorate the percentages down accordingly.

14

<u>EXHIBIT C</u>

KEMPER VALVE & FITTINGS CORP.
CONFIDENTIALITY AND NON-COMPETE AGREEMENT

 This CONFIDENTIALITY AND NON-COMPETE AGREEMENT is made as of the __ day of _____, 20__ between KEMPER VALVE & FITTINGS CORP., an Illinois corporation with its principal office in Wauconda, Illinois (the "Company"), and _____ of _, Illinois ("Employee").

W I T N E S S E T H:

 WHEREAS, Company now has and expects to develop confidential, proprietary and/or trade secret information and materials and highly sensitive information of immeasurable value, which Employee recognize must be carefully protected for Company to be successful;

 WHEREAS, Company now has and expects to develop long term customer relationships and information concerning such customers and their needs and requirements, which are also of immeasurable value to Company and which Employee recognize must be carefully protected for Company to be successful;

 WHEREAS, Company will employ or is currently employing Employee in a position of trust and confidence;

 WHEREAS, this Agreement is a material inducement for Company to continue to employ Employee and allow the Employee to participate in the Amended and Restated Kemper Valve & Fittings Corp. 2000 Incentive Compensation and Employee agrees to the following obligations and covenants in consideration of his continued employment by Company and the Employee's being selected to participate in the Amended and Restated Kemper Valve & Fittings Corp. 2000 Incentive Compensation Plan;

 1. <u>AMENDED AND RESTATED KEMPER VALVE & FITTINGS CORP. 2000 INCENTIVE COMPENSATION PLAN</u>.  Employee specifically acknowledges and agrees to the covenants set forth in Section 2 in consideration for the Employee's participation in the Amended and Restated Kemper Valve & Fittings Corp. 2000 Incentive Compensation Plan as well as in consideration of his continued employment by Company.

 2. (a) <u>Position of Loyalty</u>. In the course of Employee's past and future employment with the Company, and because of the nature of Employee's responsibilities, Employee has previously acquired, and may in the future acquire additional, valuable trade secrets, proprietary data and other confidential information (collectively, "Confidential Information") with respect to the Company's

15

customers, suppliers, competitors and business. Such trade secrets, proprietary data and other confidential information include but are not limited to the following: the Company's existing and contemplated services, products, business and financial methods and practices, plans, pricing, selling techniques, manufacturing systems, computer hardware and software systems, product technologies and formulae, and special methods and processes involved in providing services, lists of the Company's present and prospective suppliers and/or customers, methods of obtaining suppliers and customers, credit and financial data of the Company's present and prospective suppliers and/or customers, particular business requirements of the Company's present and prospective customers, inventions and confidential engineering, products or technical data, including plans, specifications, drawings and sketches. In addition, Employee on behalf of the Company, has developed, and may in the future further enhance or develop, personal acquaintances and relationships with the Company's present and prospective suppliers and customers, which acquaintances and relationships may constitute the Company's only contact with such persons or entities. As a consequence thereof, the parties agree that Employee occupies or will occupy a position of trust and confidence with respect to the Company's affairs and its products and services. In view of the foregoing and in consideration of the remuneration to be paid to Employee under the Amended and Restated Kemper Valve & Fittings Corp. 2000 Incentive Compensation Plan and for his employment, Employee acknowledges and agrees that it is reasonable and necessary for the protection of the goodwill and business of the Company that Employee make the covenants contained in subparagraphs (b) through (f) below regarding the conduct of Employee during and subsequent to employment with the Company, and that the Company will suffer irreparable injury if Employee engages in conduct prohibited thereby. Employee represents that observance of the aforementioned covenants will not cause Employee any undue hardship nor will it unreasonably interfere with Employee's ability to earn a livelihood. The covenants contained in subparagraphs (b) through (f) below shall each be construed as a separate agreement independent of any other provision of this Agreement, and the existence of any claim or cause of action of Employee against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of any of those covenants.

(b) Non-Disclosure. Employee, while in the employ of the Company or at any time thereafter, will not, without the express written consent of the Company, directly or indirectly communicate or divulge to, or use for his own benefit or for the benefit of any other person, firm, association or corporation, any of the Company's Confidential Information which was communicated to or otherwise learned of or acquired by Employee during the course of his employment with the Company; provided, however, Employee may disclose or use such information under any of the following circumstances: (i) disclosure or use thereof in good faith by Employee in connection with the performance of his duties in the course of his employment by the Company, and (ii) disclosure or use by Employee of any such information or data which is generally known within the industry or is otherwise available through independent sources.

(c) Return of Information. Promptly after the termination of his employment with the Company for any reason and whether or not pursuant to an employment agreement, Employee will deliver to the Company all originals and copies of all Confidential Information, including but not

16

limited to memoranda, customer lists, samples, records, documents, computer programs, product information and other materials requested by the Company which he has obtained from the Company while serving in any such capacity.

(d) <u>Non-Competition</u>. During Employee's employment with the Company, and for a period of two (2) years following termination of Employee's employment with the Company for any reason whatsoever (or, if this period shall be unenforceable by law, then for such lesser period as shall be required by law to make the provisions of this subparagraph enforceable), Employee shall not, in any state of the United States or in any foreign country where the Company is conducting its business, without the express written consent of the Company, directly or indirectly, own, manage, participate in or otherwise engage in or have any connection with any business which provides any product or service now or at any time provided by the Company during Employee's employment with the Company except that Employee shall not be precluded hereby from (i) owning stock or any other securities in a publicly traded company where such investment entitles Employee to less than 1% of the voting control over such company, or (ii) working as an employee, after the termination of Employee's employment with the Company, for any entity in which Employee has no ownership interest, or option or other right to acquire an ownership interest, in any capacity where the likelihood of Employee's breach or violation of the provisions of subparagraphs (b) and (f) is demonstrated to the reasonable satisfaction of the Company to be remote.

(e) <u>Non-Solicitation of Customers</u>. During Employee's employment with the Company, and for a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever (or if this period shall be unenforceable by law, then for such lesser period as shall be required by law to make the provisions of this subparagraph enforceable), and except in the good faith furtherance of the interests of the Company, Employee will not, without the express written consent of the Company, contact (whether or not initiated by Employee), with a view toward selling any product or service competitive with any product or service sold, to Employee's knowledge, or proposed to be sold by the Company at the time of such contact, any person, firm, association or corporation: which during the preceding two years was one of the top twenty (20) customers of the Company. Employee will not directly or indirectly make any such contact, either for his benefit or for the benefit of any person, firm, association or corporation, and Employee will not in any manner assist any such person, firm, association or corporation to make any such contact.

(f) <u>Non-Interference</u>. During Employee's employment with the Company, and for a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever (or if this period shall be unenforceable by law, then for such lesser period as shall be required by law to make the provisions of this subparagraph enforceable), Employee shall not induce or encourage, directly or indirectly, (i) any employee of the Company to leave his or her employment, or to seek employment with anyone other than the Company, unless it has been determined by the Company that such employee's performance or other characteristics or circumstances are such that employee's leaving the Company is in the best interests of the Company, or (ii) any customer or supplier of the Company to modify or terminate any relationship, whether or

17

not evidenced by a written contract, with the Company unless it has been determined by the Company that such modification or termination is in the best interests of the Company.

     3.    <u>SPECIFIC PERFORMANCE</u>.  Employee acknowledges and agrees that the restrictions set forth in Section 2 are reasonable and necessary for the protection of the Company's business and goodwill and that the Company will suffer irreparable injury if Employee engages in the conduct prohibited thereby. Employee further agrees that if he breaches or attempts to breach any of his obligations under Section 2, the Company, in addition to any other remedies available to it under law, may obtain injunctive relief against him to prevent such continued or attempted breach, with no bond or surety required by Company in connection therewith, and the Company may recover any damages it may incur as a result of any such continued or attempted breach and for the enforcement of Section 2. The Company shall also have all rights and remedies set forth in the Amended and Restated Kemper Valve & Fittings Corp. 2000 Incentive Compensation Plan.

     4.    <u>WAIVER</u>.  The waiver by either party of a breach or provision of this Agreement by the other shall not operate or be construed as a waiver of any subsequent breach by such other party.

     5.    <u>AMENDMENT</u>.  This Agreement may not be changed orally or rescinded, but may only be changed or rescinded by a written instrument signed by the party to be changed.

     6.    <u>NOTICES</u>.  Any notice permitted or required hereunder shall be sufficient if in writing, sent by registered or certified mail, return receipt requested, and, in the case of the Company or the Company, to its principal business address, and in the case of Employee, to his last known residence address as listed on Employee's records with the Company, or as otherwise provided in a written notice by a party.

     7.    <u>BENEFITS AND ASSIGNABILITY</u>.  This Agreement shall inure to the benefit of and be binding upon the parties and their successors and assigns, provided, however, the duties of Employee under this Agreement are personal to him and may not be assigned by him.

     8.    <u>SEVERABILITY</u>.  The invalidity, illegality, or unenforceability of any provision hereof shall not in any way affect, impair, invalidate or render unenforceable this agreement or any other provision hereof.

     9.    <u>GOVERNING LAW</u>.  Notwithstanding that any of the parties hereto may now, or at any time during the term of this Agreement, be domiciled outside of the State of Illinois, this Agreement shall be regarded for all purposes as an Illinois document and the validity and construction hereof, and all acts and payments required hereunder, shall be determined and governed, in all respects, by the laws of the State of Illinois.

IN WITNESS WHEREOF, the parties hereto have caused these presents to be duly executed the day and year above written.

KEMPER VALVE & FITTINGS CORP.

By:_____

Its: President

EMPLOYEE:

_____